Barry I. Levy (BL - 2190)
Evan Krinick (EK - 4271)
RIVKIN, RADLER, LLP
926 RexCorp Plaza
Uniondale, New York 11556
Telephone:    (516) 357-3000
Facsimile:    (516) 357-3333

-and-

Ross O. Silverman (RS - 4567)
Keir N. Dougall (KD - 5252)
KATTEN MUCHIN ROSENMAN, LLP
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Counsel for Plaintiff, Travelers Indemnity Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
TRAVELERS INDEMNITY COMPANY,

                                        Plaintiff,

                    -against-

LIBERTY MEDICAL IMAGING ASSOCIATES, P.C. d/b/a
 RICHMOND HILL IMAGING,
OMF MEDICAL IMAGING, P.C.,
QUEENS DIAGNOSTIC IMAGING, P.C.,
OCEAN DIAGNOSTIC IMAGING, P.C.,
BIG APPLE MEDICAL DIAGNOSTIC, P.C.,
METRO DIAGNOSTIC IMAGING, P.C.,

            Collectively the "Zinn PC Defendants"

            -and-

OPH MANAGEMENT, INC.,
SCAN MANAGEMENT, CO., INC.,
ALEXANDER KALUZHSKY,
ALEX SINGER,

            Collectively the "Liberty Management Defendants"

            -and-

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    JUN 22 2007    *

BROOKLYN OFFICE

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    JUN 22 2007    *

BROOKLYN OFFICE

‑07    2519

SIFTON, J.

J. ORENSTEIN, M.J.

Docket No.:

**Plaintiff Demands A
Trial By Jury**

TOL MANAGEMENT CO., INC.,
ANATOLI MERENZON,

> Collectively the "OMF Management Defendants"

-and-

BJ MANAGEMENT, LLC,
BERNARD JOSEPH,

> Collectively the "Queens Management Defendants"

-and-

KINGS MEDICAL MANAGEMENT, INC.,
EDWARD TAUBES,

> Collectively the "Ocean Management Defendants"

-and-

YAN MOSHE a/k/a YAN LEVIYEV,
BORIS MOSHEYEV,
VYACHESLAV SADYKOV a/k/a STEVE SADYKOV,
M & R MANAGEMENT OF NY, INC.,
WORLD TRADE CONSULTING MANAGEMENT
 GROUP, INC.,

> Collectively the "Big Apple Management Defendants"

-and-

ALEXANDER BROMBERG,
CLEARVIEW HEALTH MANAGEMENT, INC.,
GRAND HEALTH MANAGEMENT, INC.,

> Collectively the "Metro Management Defendants".

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiff, Travelers Indemnity Company (hereinafter referred to as "Travelers" or

"Plaintiff"), as and for its complaint as against the Defendants, hereby alleges as follows:

2

## INTRODUCTION

1.        This action seeks to recover more than One Million One Hundred Thousand ($1,100,000.00) Dollars that the Defendants have wrongfully obtained from Travelers by submitting, and causing to be submitted, thousands of fraudulent charges for radiology services (i.e. MRI studies) that were allegedly rendered for diagnostic purposes to persons involved in automobile accidents ("Insureds") in New York. In addition, Travelers seeks a declaration that it is not legally obligated to pay reimbursement on any claims submitted by Liberty Medical Imaging Associates, P.C. d/b/a Richmond Hill Imaging, OMF Medical Imaging, P.C., Queens Diagnostic Imaging, P.C., Ocean Diagnostic Imaging, P.C., Big Apple Medical Diagnostic, P.C. and Metro Diagnostic Imaging, P.C. (the "Zinn PC Defendants"), because:

(i)        The Zinn PC Defendants were fraudulently incorporated, and therefore, ineligible to seek or recover no-fault benefits;

(ii)       The technical component of radiology services billed to Travelers were not provided by individuals employed by the Zinn PC Defendants; and

(iii)      The Zinn PC Defendants engaged in unlawful fee splitting with non-medical professionals.

2.        The Defendants fall into the following categories:

(i)        The Zinn PC Defendants are New York professional service corporations, through which radiology services were performed and billed to insurance companies, including Travelers. The Zinn PCs were nominally owned on paper by Dr. Zinn but always have been actually owned and controlled by non-medical professionals;

(ii)       Alexander Kaluzhsky, Alex Singer, Scan Management, Co., Inc. and OPH Management Corp. (collectively referred to as the "Liberty Management Defendants") are the non-medical professionals that actually owned and controlled Liberty Medical Imaging Associates, P.C. d/b/a Richmond Hill Imaging;

(iii)      Anatoli Merezon and TOL Management Company, Inc. (collectively referred to as the "OMF Management Defendants") are the non-medical professionals that actually owned and controlled OMF Medical Imaging, P.C.;

3

(iv)   Bernard Joseph and BJ Management, LLC (collectively referred to as the "Queens Management Defendants") are the non-medical professionals that actually owned and controlled Queens Diagnostic Imaging, P.C.;

(v)   Edward Taubes and Kings Medical Management, Inc. (collectively referred to as the "Ocean Management Defendants") are the non-medical professionals that actually owned and controlled Ocean Diagnostic Imaging, P.C.;

(vi)   Yan Moshe a/k/a Yan Leviyev, Boris Mosheyev, Vyacheslav Sadykov a/k/a Steve Sadykov, M & R Management of N.Y., Inc. and World Trade Consulting Management Group, Inc. (collectively referred to as the "Big Apple Management Defendants") are the non-medical professionals that actually owned and controlled Big Apple Medical Diagnostic, P.C.; and

(vii)   Alexander Bromberg, Clearview Health Management, Inc. and Grand Health Management, Inc. (collectively referred to as the "Metro Management Defendants") are the non-medical professionals that actually owned and controlled Metro Diagnostic Imaging, P.C..

3.   As discussed below, the Defendants have at all times relevant known that (a) Dr. Zinn was not the real owner of any of the Zinn PC Defendants, (b) the Zinn PC Defendants and were actually owned and controlled by persons not licensed to practice medicine; (c) the Zinn PC Defendants were engaged in illegal fee splitting with non-medical professionals, and (d) the Zinn PC Defendants were and are ineligible to submit charges to Travelers for payment for the technical component of the radiology services that are claimed to have been rendered (customarily 80% of the charge submitted) because the Zinn PC Defendants did not provide the technical component of the service with respect to the claims.

## THE PARTIES

### I.   Plaintiff

4.   Travelers is a Connecticut corporation with its principal place of business in Hartford, Connecticut.   Travelers is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

4

**II.   The Zinn PC Defendants**

5.     Liberty Medical Imaging Associates, P.C. d/b/a Richmond Hill Imaging ("Liberty") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner, officer and director of Liberty. Liberty was fraudulently incorporated in July of 1999, and always has been owned and controlled by persons not licensed to practice medicine.

6.     OMF Medical Imaging, P.C., ("OMF") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner, officer and director of OMF. OMF was fraudulently incorporated in August of 2002, and always has been owned and controlled by persons not licensed to practice medicine.

7.     Queens Diagnostic Imaging, P.C., ("Queens") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner, officer and director of Queens. Queens was fraudulently incorporated in July of 2002, and always has been owned and controlled by persons not licensed to practice medicine.

8.     Ocean Diagnostic Imaging, P.C., ("Ocean") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner officer and director of Ocean. Ocean was fraudulently incorporated in April of 2001, and always has been owned and controlled by persons not licensed to practice medicine.

9.     Big Apple Medical Diagnostic, P.C., ("Big Apple") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner officer and director of Big Apple. Big Apple was fraudulently incorporated in January of 2002, and always has been owned and controlled by persons not licensed to practice medicine.

10.     Metro Diagnostic Imaging, P.C., ("Metro") is a New York medical professional corporation. Prior to May of 2005, Dr. Zinn falsely purported to be the sole owner officer and director of Metro. Metro was fraudulently incorporated in August of 2000, and always has been owned and controlled by persons not licensed to practice medicine.

**III.    The Management Defendants**

11.     Alexander Kaluzhsky ("Kaluzhsky") resides in and is a citizen of the State of New York. Kaluzhsky has never been a licensed medical professional.

12.     Alex Singer ("Singer") resides in and is a citizen of the State of New York. Singer has never been a licensed medical professional.

13.     Scan Management, Co., Inc. ("Scan") and OPH Management Corp. ("OPH") are New York corporations with their principal place of business in New York. At all relevant times, Scan and OPH were owned and controlled by Kaluzhsky and/or Singer. Since January 2000, Scan and OPH have been used as tools to illegally own and control Liberty and to illegally siphon revenues generated by Liberty through billings submitted to insurance companies, including Travelers, for radiology services.

14.     Anatoli Merezon ("Merezon") resides in and is a citizen of the State of New York. Merezon has never been a licensed medical professional.

15.     TOL Management Company, Inc. ("TOL") is a New York corporation with its principal place of business in New York. At all relevant times, TOL was owned and controlled by Merezon. Since August of 2002, TOL has been used as a tool to illegally own and control OMF and to illegally siphon revenues generated by OMF through billings submitted to insurance companies, including Travelers, for radiology services.

6

16.     Bernard Joseph ("Joseph") resides in and is a citizen of the State of New York. Joseph has never been a licensed medical professional.

17.     BJ Management, LLC ("BJ") is a New York Limited Liability Company with its principal place of business in New York. At all relevant times, BJ was owned and controlled by Joseph. Since August of 2002, BJ has been used as a tool to illegally own and control Queens and to illegally siphon revenues generated by Queens through billings submitted to insurance companies, including Travelers, for radiology services.

18.     Edward Taubes ("Taubes") resides in and is a citizen of the State of New York. Taubes has never been a licensed medical professional.

19.     Kings Medical Management, Inc. ("Kings") is a New York Corporation with its principal place of business in New York. At all relevant times, Kings was owned and controlled by Taubes. Since April of 2001, Kings has been used as a tool to illegally own and control Ocean and to illegally siphon revenues generated by Ocean through billings submitted to insurance companies, including Travelers, for radiology services.

20.     Yan Moshe a/k/a Yan Leviyev ("Moshe") resides in and is a citizen of the State of New York. Moshe has never been a licensed medical professional.

21.     Boris Mosheyev (Mosheyev") resides in and is a citizen of the State of New York. Moshe has never been a licensed medical professional.

22.     Vyacheslav Sadykov a/k/a Steve Sadykov ("Sadykov") resides in and is a citizen of the State of New York. Sadykov has never been a licensed medical professional.

23.     M & R Management of N.Y., Inc. ("M & R") and World Trade Consulting Management Group, Inc. ("WTC") are New York corporations with their principal places of

7

business in New York. At all relevant times, M & R and WTC were owned, and controlled by Moshe, Mosheyev and Sadykov. Since May of 2002, M & R and WTC have been used as tools to illegally own and control Big Apple and to illegally siphon revenues generated by Big Apple through billings submitted to insurance companies, including Travelers, for radiology services.

24.     Alexander Bromberg ("Bromberg") resides in and is a citizen of the State of New York. Bromberg has never been a licensed medical professional.

25.     Clearview Health Management, Inc ("Clearview") and Grand Health Management, Inc. ("Grand") are New York corporations with their principal places of business in New York. At all relevant times, Clearview and Grand were owned and controlled by Bromberg. Since August 2000, Clearview and Grand have been used as tools to illegally own and/or control Metro and to illegally siphon revenues generated by Metro through billings submitted to insurance companies, including Travelers, for radiology services.

26.     The Defendants identified in paragraphs 11 through 25 are collectively referred to as the "Management Defendants."

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §1367 and under the Declaratory Judgment Act, 28 U.S.C. §2201 and §2202.

8

28.     Venue in this District is appropriate pursuant to 28 U.S.C. §1391 because one or more Defendants reside in this District and substantial activities forming the basis of the complaint occurred here.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Statutes

29.     Travelers underwrites automobile insurance in the State of New York.

30.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive necessary healthcare services. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

31.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

32.     An Insured can assign his/her right to No-Fault Benefits to healthcare service providers. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

33.     Pursuant to the No-Fault Laws, fraudulently incorporated professional corporations are not eligible for No-Fault Benefits. In New York, only a licensed medical doctor

9

may; practice medicine; own and control a professional service corporation authorized to practice medicine, employ and supervise other physicians, and, absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.    The No-Fault Laws provide in relevant part:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ... (emphasis provided). See 1 NYCRR §65-3.16(a)(12)

35.    In addition, healthcare providers are not eligible for No-Fault Benefits unless they actually provide the service. Therefore, professional service corporations are not eligible for No-Fault Benefits if the services were rendered by persons who were not their employees.

36.    Pursuant to § 403 of the New York State Insurance Law, NF-3s (i.e. claim forms), must be verified by the healthcare provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Workers Compensation Fee Schedule and Radiology Ground Rules

37.    The New York Workers Compensation Fee Schedule (the "Fee Schedule") governs the maximum permissible charges for radiology services provided to Insureds.

38.    Ground Rule 6 of the Fee Schedule governs charges for radiological services. It states that the "listed values are for the technical component plus the professional component," and indicates that "Total reimbursement for the professional and technical components shall not exceed the listed value for the total procedure, regardless of sites where the services are rendered." The professional component refers to the physician's interpretation of the film as

10

well as the preparation of the report, and the technical component refers to the performance of the actual procedure.

39. The Fee Schedule allocates a certain percentage of each charge for radiology services between the technical and professional components. For example, twenty (20%) percent of the charge for a lumbar MRI would be allocated to the professional component and eighty (80%) of the charge would be allocated to the technical component. Thus, when the Zinn PC Defendants have billed for a lumbar MRI at $912.00 per the Fee Schedule, only $182.40 of the charge was for Dr. Zinn's purported interpretation.

## III. The Scheme - The Fraudulent Incorporation and Operation of the Zinn PC Defendants

40. From at least August 2000 through the present, the Management Defendants and Dr. Zinn implemented a massive fraud scheme through which they billed the New York automobile insurance industry more than $20,000,000 through the Zinn PC Defendants which were illegally owned and controlled by non-medical professionals ineligible for No-Fault Benefits.

41. To accomplish this scheme, the Management Defendants paid Dr. Zinn to act as the nominal owner of the Zinn PCs. The Zinn PCs were then used as the conduit to collect No-Fault Benefits for radiology services rendered at imaging centers that were owned and/or controlled by the Management Defendants in Brooklyn and Queens.

42. The Zinn PC Defendants signed management/consulting agreements which permitted the Management Defendants to (i) siphon virtually all proceeds of the Zinn PC Defendants, and (ii) exercise total control over the Zinn PC Defendants and their receivables. For example, despite the fact that Dr. Zinn was diagnosed with terminal cancer in the middle of

11

2003 and was physically incapacitated to a point that by early to mid 2004 he was incapable of performing professional services, the Zinn PC Defendants continued to bill Travelers without him deriving any financial benefit.

43.     The Management Defendants essentially cut Dr. Zinn off from receiving any payment from the Zinn PC Defendants after mid to late 2003, while continuing to pay themselves:

| Zinn PC | Last Payment to Zinn | Last Payment to Mgmt Co. | Amount Paid |
|---|---|---|---|
| Metro | July 26, 2003 | March 10, 2005 | $122,565.60 |
| OMF | April 5, 2004 | March 5, 2006 | $359,400.00 |
| Big Apple | November 30, 2002 | July 20, 2006 | $363,623.29 |
| Queens | September 16, 2003 | May 23, 2005 | $610,970.00 |
| Ocean | August 18, 2003 | September 27, 2005 | $1,718,349.00 |
| Liberty | September 27, 2002 | September 20, 2005 | $2,883,794.43 |

44.     The Zinn PCs funneled money to the Management Defendants by designatng themselves as officers of the PCs and/or signatories on the PC's bank account, as well as applying Dr. Zinn's signature stamp on checks payable issued to themselves and to others. From at least 2000-2005, Dr. Zinn did not sign a single check of the Zinn PC Defendants.

45.     Although Dr. Zinn died on May 17, 2005, the Management Defendants continued to use Dr. Zinn's signature stamp to issue payments to themselves and to others:

| Zinn PC | Checks (Post Death) | Checks (Mgmt Co.- Post Death) |
|---|---|---|
| Liberty | 22 | 22 (All signed by Alex Singer) |
| OMF | 28 | 28 (10 checks stamped – Dr. Zinn) |
| Queens | 1 | 1 (All signed by Bernard Joseph) |

12

| Ocean     | 3  | 1 (check stamped – Dr. Zinn)     |
|-----------|----|----------------------------------|
| Big Apple | 30 | 13 (8 checks stamped - Dr. Zinn) |

46.     As discussed below, Dr. Zinn was never the true shareholder, director and officer of the Zinn PC Defendants, and had no genuine ownership interest in or control over them. True ownership and control of the Zinn PC Defendants rested entirely with the Management Defendants, who used the facade of the Zinn PC Defendants to do indirectly what they were forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

## A.     The Fraudulent Incorporation/Operation of Liberty

47.     In 1999, Kaluzhsky recruited Dr. Zinn to become the paper "owner" of Liberty d/b/a Richmond Hill Imaging. From 2000 through early 2002, Liberty was actually owned and controlled by Kaluzhsky and Scan. To facilitate Kaluzhsky's ownership and control of Liberty, Kaluzhsky was an authorized signatory on its bank account at JP Morgan Chase.

48.     From 2000 to 2005, Liberty purported to operate from an imaging center at 130-11 Liberty Avenue in Richmond Hill, New York, which was also the address used by OMF and Queens.

49.     On January 11, 2002, Singer incorporated OPH using the same 130-11 Liberty Avenue address, and the ownership and control of Liberty was transferred shortly thereafter from Kaluzhsky and Scan to Singer and OPH. On February 8, 2002, Singer replaced Kaluzhsky as the authorized signer for Liberty's JP Morgan Chase bank account. In addition, a separate account for Liberty was established with JP Morgan Chase on which Singer was the authorized signer.

50.     To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing Liberty to be formed to practice medicine, Kaluzhsky entered into a scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of Liberty and that he truly owned, controlled and practiced through it. The scheme continued when Singer and OPH took over the ownership and control of Liberty in February of 2002.

51.     Dr. Zinn has never been the true shareholder, director and officer of Liberty, and had no ownership interest in or control over it. True ownership and control of Liberty from July 1999 to February of 2002 rested entirely with Kaluzhsky and Scan. True ownership and control of Liberty from February 2002 to this day has rested entirely with Singer and OPH. Kahlusky and Singer, through their management companies, Scan and OPH, used the facade of Liberty to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

52.     Furthermore, Kahluzhsky and Singer used Scan and OPH as tools to secretly (i) exercise control over Liberty under the guise of a legitimate "management" company and (ii) siphon the revenue generated by Liberty to themselves. The sole purpose of establishing the relationship between Liberty, Scan and OPH was to facilitate the collection of fraudulent charges from Travelers and other insurers for radiology services that Liberty was not lawfully entitled to collect, and to siphon the proceeds to Kahluzhsky and Singer.

53.     To illustrate, from February 2000 through May 2005, Liberty's checks to Scan and OPH were more than $5,600,000. During the same period, Liberty's checks to Dr. Zinn were $274,000. This means that approximately 95% of Liberty's revenues went to Scan and

14

OPH. Moreover, Liberty's last check to Dr. Zinn was on September 27, 2002, more than 30 months prior to his death, and Liberty paid OPH more than $100,000 after Dr. Zinn died.

54.     According to its tax returns and W-2 forms, Liberty had no employees other than Dr. Zinn. Therefore, the technical component of every radiology service that was billed to Travelers through Liberty was performed by persons who were not Liberty's employees.

55.     The ownership and control of Liberty by non-physicians compromises patient care, as the provision of health services by Liberty is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

56.     Because Liberty was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and not owned or controlled by a licensed medical physician, it was ineligible to receive No-Fault Benefits. In addition, Liberty was not eligible to collect No-Fault Benefits for the technical component of the radiology services because they were not performed by an employee of Liberty.

**B.     The Fraudulent Incorporation/Operation of OMF**

57.     In August of 2002, Merezon recruited Dr. Zinn to be the paper "owner" of OMF, another radiology professional corporation that operated out of the same imaging center as Liberty - 130-11 Liberty Avenue in Richmond Hill, New York.

58.     Dr. Zinn was never the true shareholder, director and officer of OMF, and had no ownership interest in or control over it. True ownership and control of OMF always has rested entirely with Merezon and his management company, TOL, which used the facade of OMF to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and

15

other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

59.     To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing OMF to be formed to practice medicine, Merezon entered into a scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of OMF and that he truly owned, controlled and practiced through it.

60.     Merezon formed TOL on August 9, 2002, just 14 days prior to OMF's incorporation. On November 20, 2002, Merezon established an account for OMF with JP Morgan Chase Bank listing himself as OMF's President.

61.     From November 2002 until March of 2006, all checks from OMF's account were either signed by Merezon or a signature stamp of Dr. Zinn. Despite the fact that Dr. Zinn died on May 18, 2005, Merezon continued to use Dr. Zinn's signature stamp and continued to issue checks from OMF's account. 28 checks were issued by Merezon after Dr. Zinn's death, 10 of which were issued using Dr. Zinn's signature stamp.

62.     Merezon used TOL to secretly (i) exercise control over OMF under the guise of a legitimate "management" company and (ii) siphon OMF's revenue to himself. The sole purpose of establishing the relationship between TOL and OMF was to facilitate billing and collection of fraudulent charges from Travelers and other insurers for radiology services that OMF was not lawfully entitled to collect, and to siphon the proceeds to Merezon.

63.     To illustrate, virtually all of OMF's revenue was siphoned to Merezon through TOL. For example, from November 2002 to January 2006, $256,585 was paid to Dr. Zinn from

the OMF account. In contrast, $1,676,057.62 was paid to TOL from the OMF bank account during that same period, and more than $89,000 was paid after Dr. Zinn died. The last check written to Dr. Zinn from OMF's account was on April 5, 2004, more than one (1) year prior to his death.

64.     According to OMF's tax returns and W-2 forms, it had no employees other than Dr. Zinn. Therefore, the technical component of every radiology service billed to Travelers through OMF was performed by persons who were not OMF's employees.

65.     The ownership and control of OMF by non-physicians compromises patient care, as the provision of health services by OMF is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

66.     Because OMF was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and not owned or controlled by a licensed medical physician, it was ineligible to receive No-Fault Benefits. In addition, OMF was not eligible to collect No-Fault Benefits for the technical component of the radiology services because they were not performed by an employee of OMF.

### C.     The Fraudulent Incorporation/Operation of Queens

67.     In July of 2002, Joseph recruited Dr. Zinn to become the paper "owner" of Queens, a radiology professional corporation that operated out of the same location where Liberty and OMF operated - 130-11 Liberty Avenue in Richmond Hill, New York. In fact, Queens' certificate of incorporation listed the 130-11 Liberty Avenue address as its service address.

68.    Dr. Zinn has never been the true shareholder, director and officer of Queens, and had no ownership interest in or control over it.   True ownership and control of Queens always has rested entirely with Joseph and his management company, BJ, which then used the facade of Queens to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

69.    To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing Queens to be formed to practice medicine, Joseph entered into a scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of Queens and that he truly owned, controlled and practiced through the professional corporation.

70.    Joseph formed BJ on June 20, 2002, approximately 30 days prior to Queens' incorporation.   On August 13, 2002, Joseph established a business account for Queens with JP Morgan Chase Bank, listing himself as Queens' Vice-President.

71.    Joseph used BJ as a tool to secretly (i) exercise control over Queens under the guise of a legitimate "management" company and (ii) siphon Queens' revenue to Joseph.   The sole purpose of establishing the relationship between BJ and Queens was to facilitate the collection of fraudulent charges from Travelers and other insurers for radiology services that Queens was not lawfully entitled to collect, and to siphon the insurance proceeds to Joseph.

72.    To illustrate, virtually all of Queens' revenue was siphoned to Joseph through BJ. For example, from October 2002 through May 2005, Queens paid BJ more than $2,346,798, representing more than 86% of the total deposits into Queens' account.   Moreover, Queens' last payments to Dr. Zinn were on September 16, 2003 (approximately 1 ½ years before Dr. Zinn

18

died). Despite the fact that Joseph ceased paying Dr. Zinn after September of 2003, from September 17, 2003 through May 23, 2005, he paid himself (through checks written to BJ) more than $610,000, including payments after Dr. Zinn's death.

73.     According to its tax returns and W-2 forms, Queens had no employees other than Dr. Zinn.   Therefore, the technical component of every radiology service that was billed to Travelers through Queens was performed by persons who were not Queens' employees.

74.     The ownership and control of Queens by non-physicians compromises patient care, as the provision of health services by Queens is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

75.     Because Queens was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and was not owned or controlled by a licensed medical physician, it was ineligible to receive No-Fault Benefits. In addition, Queens was not eligible for No-Fault Benefits for the technical component of the radiology services because they were not performed by an employee of Queens.

### D.     The Fraudulent Incorporation/Operation of Ocean

76.     In April of 2001, Taubes and a former associate (Nolik Dorfman - now deceased) recruited Zinn to become the paper "owner" of Ocean, a radiology professional corporation that operated out of an imaging center owned/controlled by Taubes and located on the first floor of 1401 Ocean Avenue in Brooklyn, New York.

77.     Dr. Zinn has never been the true shareholder, director and officer of Ocean, and had no ownership interest in or control over it. True ownership and control of Ocean has always

19

rested entirely with Taubes and his management company, Kings, which then used the facade of Ocean to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

78.     To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing Ocean to be formed to practice medicine, Taubes and Dorfman entered into a scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of Ocean and that he truly owned, controlled and practiced through the professional corporation. .

79.     Taubes formed Kings on April 12, 2001, just 2 weeks prior to Ocean's incorporation.  On June 19, 2001 Taubes established a business account for Ocean with JP Morgan Chase Bank listing himself as an authorized signer and directing a sole signature to be sufficient to issue checks.

80.     From August of 2001 through May 2005, every check from Ocean's bank account was signed by Taubes or issued using a signature stamp of Dr. Zinn.  Dr. Zinn never actually signed any of the checks.

81.     Taubes used Kings as a tool to secretly (i) exercise control over Ocean under the guise of a legitimate "management" company and (ii) siphon Ocean's revenue to himself.  The sole purpose of establishing the relationship between Kings and Ocean was to facilitate the collection of fraudulent charges from Travelers and other insurers for radiology services that Ocean was not lawfully entitled to collect, and to siphon the insurance proceeds to Taubes.

82.     To illustrate, virtually all of Ocean's revenue was siphoned to Taubes through Kings. For example, from December 2001 through September 2005, Taubes wrote checks to Kings totaling more than $5,973,581, representing more than 89% of the total deposits into Ocean's account. The last check actually written to Dr. Zinn from Ocean's account was on August 18, 2003, more than twenty one (21) months prior to his death. Despite the fact that Taubes stopped paying Dr. Zinn after August of 2003, he continued to pay himself by continuing to issue checks to Kings. From August 19, 2003 through September 27, 2005, Taubes paid himself (through checks that we issued to Kings) more than $1,718,349, including payments after Dr. Zinn's death.

83.     According to Ocean's tax returns and W-2 forms, it had no employees other than Dr. Zinn. Therefore, the technical component of every radiology service billed to Travelers through Ocean was performed by persons who were not Ocean's employees.

84.     The ownership and control of Ocean by non-physicians compromises patient care, as the provision of health services by Queens is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

85.     Because Ocean was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and not owned or controlled by a licensed medical physician, the professional corporation was ineligible to receive reimbursement under the No-Fault Laws for services that were rendered and billed to insurance companies, including Travelers. In addition, because the technical component of the radiology service was not performed by an employee of Ocean, Ocean was ineligible to receive reimbursement under the No-Fault Laws for the technical component of the service that was billed to insurance companies, including Travelers.

**E.     The Fraudulent Incorporation/Operation of Big Apple**

86.     In January of 2002, Moshe, Mosheyez and Sadykov recruited Dr. Zinn to become the paper "owner" of Big Apple, a radiology professional corporation operated out of an imaging center owned/controlled by Moshe, Mosheyez and Sadykov, located at 117-15 101 Avenue in Richmond Hill, New York. Big Apple's certificate of incorporation listed 112-68 68th Drive, Forest Hills, New York as it address which was actually was Sadykov's residence and the address for M & R.

87.     Dr. Zinn has never been the true shareholder, director and officer of Big Apple, and had no ownership interest in or control over it. True ownership and control of Big Apple rested entirely with Moshe, Mosheyez and Sadykov and their management companies, M & R and WTC, which then used the facade of Big Apple to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

88.     To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing Big Apple to be formed to practice medicine, Moshe, Mosheyez and Sadykov entered into a secret scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of Big Apple and that he truly owned, controlled and practiced through the professional corporation.

89.     M & R was formed on May 18, 2001, 6 months prior to Big Apple's incorporation. WTC was formed on March 21, 2002, approximately 45 days after Big Apple's incorporation. On January 8, 2002 (the same date of Big Apple's incorporation), Moshe

22

established a bank account for Big Apple with JP Morgan Chase Bank listing himself as Big Apple's secretary and directing all account statements be sent to 143 Hugges Place in Albertson, New York, a location in Long Island from which more than forty (40) separate professional corporations illegally owned and controlled by Moshe operate.

90.     On November 26, 2002, Mosheyez and Sadykov established a second account for Big Apple with JP Morgan Chase Bank listing Sadykov as Biggle Apple's Secretary and Mosheyev as a authorized signatory.   They once again directed that all account statements be sent to 143 Hugges Place in Albertson, New York.

91.     None of the checks written from the Big Apple bank account were actually signed by Dr. Zinn, but rather checks were issued using a signature stamp.   More than $130,000.00 in payments were issued out of the Big Apple accounts after Dr. Zinn's death.

92.     Moshe, Mosheyez and Sadykov used M & R and WTC to secretly (i) exercise control over Big Apple under the guise of a legitimate "management" company and (ii) siphon Big Apple's revenue to themselves.   The sole purpose of establishing the relationship between Big Apple and M & R/WTC was to facilitate the collection of fraudulent charges from Travelers and other insurers for radiology services that Big Apple was not lawfully entitled to collect, and to siphon the insurance proceeds to themselves.

93.     To illustrate, virtually all of Big Apple's revenue was siphoned to Moshe, Mosheyez and Sadykov through payments made to themselves and to M&R, WTC and/or NYIC. From July 2002 through July 2006 checks were issued to Moshe, Mosheyez and Sadykov and to their management companies totaling more than $1,000,000:

.

| (i) | M & R | $478,563.73 |
|-----|-------|-------------|
| (ii) | WTC | $245,341.29 |
| (iii) | NYIC Bar Marketing | $98,750.00 |
| (iv) | NYPD Consulting & Solution, Inc. | $9,000.000 |
| (iv) | Yelena Sadykov | $86,000.00 |
| (v) | Steve Sadykov | $62,750.00 |
| (vi) | Yan Moshe | $60,789.48 |

94.     In contrast, the total amount paid to Dr. Zinn during that same time period totaled $100,050.00. The last check actually written to Dr. Zinn from the professional corporation's bank account was on November 30, 2002, more than thirty (30) months prior to his death. Despite the fact that Moshe, Mosheyez and Sadykov stopped paying Dr. Zinn after November 2002, they continued to pay themselves and their management companies. After November 30, 2002, Moshe, Mosheyez and Sadykov paid themselves and their management companies more than $443,00.00.

95.     According to Big Apple's tax returns and W-2 forms, it had no employees other than Dr. Zinn. Therefore, the technical component of every radiology service billed to Travelers through Big Apple was performed by persons who were not Big Apple's employees.

96.     The ownership and control of Big Apple by non-physicians compromises patient care, as the provision of health services by Big Apple is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

97.     Because Big Apple was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and not owned or controlled by a licensed medical

physician, the professional corporation was ineligible to receive reimbursement under the No-Fault Laws for services that were rendered and billed to insurance companies, including Travelers. In addition, because the technical component of the radiology service was not performed by an employee of Big Apple, Big Apple was ineligible to receive reimbursement under the No-Fault Laws for the technical component of the service that was billed to insurance companies including Travelers.

### F.   The Fraudulent Incorporation/Operation of Metro

98.   In August of 2000, Bromberg recruited Dr. Zinn to become the paper "owner" of Metro, a radiology professional corporation to be operated out of an imaging center owned/controlled by Bromberg, and located at 2104 East 24th Street in Brooklyn, New York.

99.   Dr. Zinn has never been the true shareholder, director and officer of Metro, and had no ownership interest in or control over it. True ownership and control of Metro has always rested entirely with Bromberg and his management companies, Clearview and Grand, which used the facade of Metro to do indirectly what they are forbidden from doing directly, namely (a) employing physicians and other licensed health care professionals, (b) controlling their practices, and (c) charging for and deriving an economic benefit from their services.

100.   To circumvent New York law and to induce the Department of Education to issue a certificate of authority authorizing Metro to be formed to practice medicine, Bromberg entered into a scheme with Dr. Zinn to falsely represent in the certificate of incorporation filed with the Department of Education that he was the true shareholder, director and officer of Metro and that he truly owned, controlled and practiced through the professional corporation.

101.   Bromberg formed Clearview on April 10, 2000, approximately 90 days prior Metro's incorporation. Grand was formed on April 6, 2001. Prior to January of 2002, Bromberg

established a bank account for Metro with Astoria Federal Savings Bank listing himself as an authorized signer.

102.    From January 2002 through April 2005, every check written from Metro's bank account was signed by Bromberg.

103.    Bromberg used Clearview and Grand to secretly (i) exercise control over Metro under the guise of a legitimate "management" company and (ii) siphon Metro's revenue to himself. The sole purpose of establishing the relationship between Metro and Clearview/Grand was to facilitate the collection of fraudulent charges from Travelers and other insurers for radiology services that Metro was not lawfully entitled to collect, and to siphon the insurance proceeds to himself.

104.    To illustrate, all of Metro's revenue was siphoned to Bromberg through Clearview/Grand. From January 2002 through December 2004, Bromberg wrote checks to Clearview/Grand totaling more than $1,120,000, representing more than 82% of the total amounts of Metro's bank deposits. The last check actually written to Dr. Zinn from Metro's bank account was on July 16, 2003. The payments made to Dr. Zinn in comparison to those which Bromberg made to himself through his management companies is illustrated, as follows:

| Payee | 2002 | 2003 | 2004 |
| --- | --- | --- | --- |
| Dr. Zinn | $39,916.00 | $1,250.00 | $0.00 |
| Clearview | $440,000.00 | $182,500.00 | $16,500.00 |
| Grand | $336,537.62 | $108,796.07 | $21,236.10 |

105.    The last payment made to Dr. Zinn was on July 16, 2003, more than twenty two (22) months prior to his death. Despite the fact that Bromberg stopped paying Dr. Zinn after July 2003, he continued to pay his management companies more than $122,000.

106.   According to Metro's tax returns and W-2 forms, it had no employees other than Dr. Zinn.   Therefore, the technical component of every radiology service billed to Travelers through Metro was performed by persons who were not Metro's employees.

107.   The ownership and control of Metro by non-physicians compromises patient care, as the provision of health services by Metro is subject to the pecuniary interests of the non-physicians as opposed to the exercise of independent medical judgment by a true doctor-owner.

108.   Because Metro was fraudulently incorporated, used as a conduit to illegally split fees with non-medical professionals, and not owned or controlled by a licensed medical physician, the professional corporation was ineligible to receive reimbursement under the No-Fault Laws for services that were rendered and billed to insurance companies, including Travelers.  In addition, because the technical component of the radiology service was not performed by an employee of Metro, Metro was ineligible to receive reimbursement under the No-Fault Laws for the technical component of the service that was billed to insurance companies including Travelers.

## VI.   The Fraudulent NF-3 Forms Submitted to Travelers

109.   To support the fraudulent radiology charges, the Zinn PCs have consistently submitted NF-3 forms to Travelers.

110.   The NF-3 forms submitted to Travelers by and on behalf of the Zinn PCs are false and misleading in the following material respects:

(i)     The NF-3 forms uniformly misrepresented to Travelers that the Zinn PCs were properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12).  In fact, the Zinn PCs were not properly licensed in that they were fraudulently incorporated and in reality, were owned and controlled by the Management Defendants who are not physicians and who owned and controlled the Zinn PCs for their sole economic

27

benefit, while designating Dr. Zinn as the "nominal" or "paper" owner.

(ii)    The NF-3 forms uniformly misrepresented to Travelers that the Zinn PCs were eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed.  In fact, the Zinn PCs were not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by their employees.

## VII.    Travelers Statutory Duty To Pay Promptly And Justifiable Reliance

111.    Travelers is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to Plaintiff in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of fraudulent concealment described above, were designed to and did cause Travelers to justifiably rely on them.  As a proximate result, Travelers has incurred damages of more than One Million One Hundred Thousand ($1,100,000.00) Dollars based upon the fraudulent charges.

112.    Because of the material misrepresentations and other affirmative acts taken by the Defendants to conceal their fraud from Travelers, Travelers did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION AGAINST THE ZINN PC DEFENDANTS
### (Declaratory Judgment Under 28 U.S.C. § 2201)

113.    Travelers repeats and realleges each and every allegation contained in Paragraphs 1 through 112 of this Complaint as if fully set forth at length herein.

114.    There is an actual case in controversy between Travelers and the Zinn PCs regarding more than Five Hundred Thousand ($500,000.00) Dollars in fraudulent billing for radiology services that has been submitted to the Travelers.

115.   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers because they were fraudulently incorporated and were owned and controlled by persons not licensed to practice medicine in New York State, and therefore, were ineligible to seek or recover No-Fault Benefits.

116.   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers to the extent that those bills seek payment for the technical component of all radiology services billed to Travelers by the professional corporations because the services were not provided by employees of the professional corporation that submitted the billing.

117.   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers because the professional corporations engaged in unlawful fee splitting.

118.   Accordingly, Travelers requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 and §2202, declaring that:

(a)   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers because the professional corporations were fraudulently incorporated, and therefore, ineligible to seek or recover No-Fault Benefits.

(b)   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers to the extent that those bills seek payment for the technical component of all radiology services billed to Travelers by the professional corporations because the services were not provided by employees of the professional corporation that submitted the billing, and

(c)   The Zinn PCs have no right to receive payment for any pending bills submitted to Travelers because the professional corporations engaged in unlawful fee splitting.

## SECOND CAUSE OF ACTION AGAINST LIBERTY AND
## THE LIBERTY MANAGEMENT DEFENDANTS
### (Common Law Fraud)

119.   Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 118 of this Complaint as if fully set forth at length herein.

29

120.    Liberty and the Liberty Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services. The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that Liberty was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned and controlled by non-medical professionals, and (b) assertions that Liberty was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of Liberty

121.    Liberty and the Liberty Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Liberty that were not compensable under the No-Fault Laws.

122.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $291,477.00 based upon the fraudulent charges.

123.    The extensive and pervasive nature of the fraudulent conduct of Liberty and the Liberty Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

124. Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against Liberty and the Liberty Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION AGAINST LIBERTY
## AND THE LIBERTY MANAGEMENT DEFENDANTS
### (Unjust Enrichment)

125. Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint as if fully set forth at length herein.

126. As set forth above, Liberty and the Liberty Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

127. When Travelers paid the bills and charges submitted by or on behalf of Liberty for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

128. Travelers' payments constituted a benefit that Liberty and the Liberty Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

129. Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

130. By reason of the above, Liberty and the Liberty Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $291,477.00.

### FOURTH CAUSE OF ACTION AGAINST OMF AND
### THE OMF MANAGEMENT DEFENDANTS
(Common Law Fraud)

131.    Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 130 of this Complaint as if fully set forth at length herein.

132.    OMF and the OMF Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services.  The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that OMF was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned and controlled by non-medical professionals, and (b) assertions that OMF was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of OMF.

133.    OMF and the OMF Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Liberty that were not compensable under the No-Fault Laws.

134.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $178,000.00 based upon the fraudulent charges.

32

135.   The extensive and pervasive nature of the fraudulent conduct of OMF and the OMF Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

136.   Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against OMF and the OMF Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION AGAINST OMF
### AND THE OMF MANAGEMENT DEFENDANTS
#### (Unjust Enrichment)

137.   Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 136 of this Complaint as if fully set forth at length herein.

138.   As set forth above, OMF and the OMF Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

139.   When Travelers paid the bills and charges submitted by or on behalf of OMF for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

140.   Travelers' payments constituted a benefit that OMF and the OMF Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

141.   Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

33

142. By reason of the above, OMF and the OMF Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $178,000.00.

## SIXTH CAUSE OF ACTION AGAINST QUEENS AND
## THE QUEENS MANAGEMENT DEFENDANTS
### (Common Law Fraud)

143. Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 142 of this Complaint as if fully set forth at length herein.

144. Queens and the Queens Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services. The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that Queens was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned and controlled by non-medical professionals, and (b) assertions that Queens was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of Queens.

145.    Queens and the Queens Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Liberty that were not compensable under the No-Fault Laws.

146.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $186,000.00 based upon the fraudulent charges.

147.    The extensive and pervasive nature of the fraudulent conduct of Queens and the Queens Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

148.    Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against Queens and the Queens Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION AGAINST QUEENS
### AND THE QUEENS MANAGEMENT DEFENDANTS
### (Unjust Enrichment)

149.    Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 148 of this Complaint as if fully set forth at length herein.

150.    As set forth above, Queens and the Queens Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

151.    When Travelers paid the bills and charges submitted by or on behalf of Queens No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

152.   Travelers' payments constituted a benefit that Queens and the Queens Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

153.   Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

154.   By reason of the above, Queens and the Queens Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $186,000.00.

## EIGHTH CAUSE OF ACTION AGAINST OCEAN AND
## THE OCEAN MANAGEMENT DEFENDANTS
### (Common Law Fraud)

155.   Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 154 of this Complaint as if fully set forth at length herein.

156.   Ocean and the Ocean Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services. The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that Ocean was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned and controlled by non-medical professionals, and (b) assertions that Ocean was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was

not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of Ocean.

157.    Ocean and the Ocean Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Ocean that were not compensable under the No-Fault Laws.

158.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $379,000.00 based upon the fraudulent charges.

159.    The extensive and pervasive nature of the fraudulent conduct of Ocean and the Ocean Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

160.    Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against Ocean and the Ocean Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION AGAINST OCEAN
## AND THE OCEAN MANAGEMENT DEFENDANTS
### (Unjust Enrichment)

161.    Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 160 of this Complaint as if fully set forth at length herein.

162.    As set forth above, Ocean and the Ocean Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

37

163.   When Travelers paid the bills and charges submitted by or on behalf of Ocean for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

164.   Travelers' payments constituted a benefit that Ocean and the Ocean Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

165.   Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

166.   By reason of the above, Ocean and the Ocean Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $379,000.00.

## TENTH CAUSE OF ACTION AGAINST BIG APPLE AND THE BIG APPLE MANAGEMENT DEFENDANTS
### (Common Law Fraud)

167.   Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 166 of this Complaint as if fully set forth at length herein.

168.   Big Apple and the Big Apple Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services. The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that Big Apple was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned and controlled by non-medical professionals, and (b) assertions that Big

38

Apple was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of Big Apple.

169.    Big Apple and the Big Apple Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Big Apple that were not compensable under the No-Fault Laws.

170.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $93,000.00 based upon the fraudulent charges.

171.    The extensive and pervasive nature of the fraudulent conduct of Big Apple and the Big Apple Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

172.    Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against Big Apple and the Big Apple Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION AGAINST BIG APPLE
### AND THE BIG APPLE MANAGEMENT DEFENDANTS
### (Unjust Enrichment)

173.    Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint as if fully set forth at length herein.

174.    As set forth above, Big Apple and the Big Apple Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

175.   When Travelers paid the bills and charges submitted by or on behalf of Big Apple for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

176.   Travelers' payments constituted a benefit that Big Apple and the Big Apple Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

177.   Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

178.   By reason of the above, Big Apple and the Big Apple Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $93,000.00 Dollars.

### TWELFTH CAUSE OF ACTION AGAINST METRO AND
### THE METRO MANAGEMENT DEFENDANTS
### (Common Law Fraud)

179.   Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 178 of this Complaint as if fully set forth at length herein.

180.   Metro and the Metro Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to Travelers and concealed material facts from Travelers in the course of their submission of thousands of fraudulent bills seeking payment for radiology services. The false and fraudulent statements of material fact and acts of fraudulent concealment relate to the following: (a) assertions that Metro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.16(a)(12) when in fact the PC was fraudulently incorporated and actually owned

and controlled by non-medical professionals, and (b) assertions that Metro was eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 NYCRR § 65-3.11 for the technical component of the radiology services that were performed when in fact the PC was not eligible to seek or pursue collection of No-Fault Benefits associated with the technical component of the radiology services because the services were not provided by employees of Metro.

181.    Metro and the Metro Management Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce Travelers to pay charges submitted by Metro that were not compensable under the No-Fault Laws.

182.    Travelers justifiably relied on the Defendants' false and fraudulent representations and as a proximate result paid more than $61,000.00 based upon the fraudulent charges.

183.    The extensive and pervasive nature of the fraudulent conduct of Metro and the Metro Management Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Travelers to recover punitive damages.

184.    Accordingly, by virtue of the foregoing, Travelers is entitled to compensatory and punitive damages against Metro and the Metro Management Defendants, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION AGAINST METRO
### AND THE METRO MANAGEMENT DEFENDANTS
### (Unjust Enrichment)

185.    Travelers repeats and realleges each and every allegation contained in paragraphs 1 through 184 of this Complaint as if fully set forth at length herein.

186.    As set forth above, Metro and the Metro Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Travelers.

187.    When Travelers paid the bills and charges submitted by or on behalf of Metro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

188.    Travelers' payments constituted a benefit that Metro and the Metro Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust scheme.

189.    Defendants' retention of Travelers' payments violate fundamental principles of justice, equity and good conscience.

190.    By reason of the above, Metro and the Metro Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $61,000.00.

## JURY DEMAND

191.    Pursuant to Federal Rule of Civil Procedure 38(b), Travelers demands a trial by jury.

**WHEREFORE**, Plaintiff, Travelers Indemnity Company demands that a judgment be entered in its favor and against the Defendants, as follows:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 and §2202, that Liberty Medical Imaging Associates, P.C., d/b/a Richmond Hill Imaging, OMF Medical Imaging, P.C., Queens Diagnostic Imaging, P.C., Ocean Diagnostic Imaging, P.C., Big Apple Medical Diagnostic, P.C. and Metro Diagnostic Imaging,

P.C. have no right to receive payment for any pending bills submitted to Travelers;

      B.      On the Second Cause of Action against Liberty and the Liberty Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $279,900.00, and punitive damages in the amount of $1,000,000.00, plus interest;

      C.      On the Third Cause of Action, for the return of all monies that Liberty and the Liberty Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $279,000.00, plus interest;

      D.      On the Fourth Cause of Action against OMF and the OMF Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $178,000.00, and punitive damages in the amount of $750,000.00, plus interest;

      E.      On the Fifth Cause of Action, for the return of all monies that OMF and the OMF Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $178,000.00, plus interest;

      F.      On the Sixth Cause of Action against Queens and the Queens Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $186,000.00, and punitive damages in the amount of $750,000.00, plus interest;

      G.      On the Seventh Cause of Action, for the return of all monies that Queens and the Queens Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $186,000.00, plus interest;

      H.      On the Eighth Cause of Action against Ocean and the Ocean Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $379,000.00, and punitive damages in the amount of $1,000,000.00, plus

interest;

I.      On the Ninth Cause of Action, for the return of all monies that Ocean and the Ocean Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $379,000.00, plus interest;

J.      On the Tenth Cause of Action against Big Apple and the Big Apple Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $93,000.00, and punitive damages in the amount of $500,000.00, plus interest;

K.      On the Eleventh Cause of Action, for the return of all monies that Big Apple and the Big Apple Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $93,000.00, plus interest;

L.      On the Twelfth Cause of Action against Metro and the Metro Management Defendants, compensatory damages in favor of Travelers in an amount to be determined at trial but in excess of $61,000.00 Dollars and punitive damages in the amount of $500,000.00, plus interest;

M.      On the Thirteenth Cause of Action, for the return of all monies that Metro and the Metro Management Defendants wrongfully obtained from Travelers in amount to be determined at trial but in excess of $61,000.00, plus interest; and

N.      Awarding Travelers its costs and disbursements and any other relief the Court deems just and proper.

Dated: June 21, 2007

44

RIVKIN RADLER, LLP

By: _____

    Barry I. Levy (BL - 2190)
    Evan Krinick (EK - 4271)
926 RexCorp Plaza
Uniondale, New York 11556
(516) 357-3000

-and-

KATTEN MUCHIN ROSENMAN, LLP
Ross O. Silverman (RS - 4567)
Keir N. Dougall (KD - 5252)
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Counsel for Plaintiff, Travelers Indemnity Company*